```
 1                              BRANCH 6
        STATE OF WISCONSIN      CIRCUIT COURT      ROCK COUNTY
 2
        * * * * * * * * * * * * * * * * * * * * * * * * *
 3
        STATE OF WISCONSIN,
 4
                Plaintiff,
 5
        -vs-                            Case No. 18CF516
 6
 7      LARRY J. WOODS,
 8              Defendant.
 9      * * * * * * * * * * * * * * * * * * * * * * * * *
10      PROCEEDINGS:    Sentencing Hearing
11      DATE:           September 27, 2019
12      COURT:          Circuit Court, Branch 6
                        The Honorable John M. Wood, Judge
13
        APPEARANCES:    Scott Dirks,
14                      Assistant District Attorney,
                        appearing for the State;
15
                        Francis Raff,
16                      Assistant Public Defender,
                        appearing for the Defendant;
17
                        Larry Woods,
18                      Defendant,
                        appearing in person.
19
20
21
22
23
24
25      Jennifer Klaren, RPR
        Court Reporter
                              1
```

```
1                    TRANSCRIPT OF PROCEEDINGS
2          THE COURT:  This is State of Wisconsin versus
3    Larry Woods, 2018CF516.  Let the record reflect the
4    appearance of Mr. Woods in person and in custody and by
5    Attorney Frank Raff.  The State appears by Assistant
6    District Attorney Scott Dirks.
7        This matter is scheduled for a sentencing hearing
8    this morning.  Are we ready to proceed today?
9          MR. DIRKS:  The State's ready, Your Honor.
10          MR. RAFF:  Yes.
11          THE COURT:  Mr. Woods has been convicted of the
12    crime of repeated sexual assault of a child pursuant to
13    a plea of guilty.  He is now before the Court for
14    purposes of sentencing.  The Court has reviewed the
15    victim impact statements that are on file with the Court
16    filed by DH, the victim's father, and DRB, the mother to
17    the victim as well as the victim impact statement filled
18    out by the mother on behalf of the victim.
19        Mr. Dirks, are there any victims who wish to address
20    the Court this morning, and are we otherwise victim
21    compliant?
22          MR. DIRKS:  Your Honor, the victim's mother very
23    much wanted to be here today.  But as the Court knows
24    from having read the presentence report, she's fallen on
25    financial hard times and got a new job.  And the new job
```

2

 1    orientation is this morning.  And she simply couldn't
 2    afford to miss that.  So no.  She won't be here.  We
 3    don't have any other witnesses.
 4        She did offer one small correction to the PSI.  I
 5    can bring that up whenever the Court wants.
 6            THE COURT:  You can bring that up now.  That's
 7    fine.
 8            MR. DIRKS:  Okay.
 9        In the top paragraph of page 8, the last sentence
10    says because of G's anger issues, DRB finds it difficult
11    to speak calmly with her.  What she meant by that was
12    that G becomes very defensive at times because of her
13    anger issues, and D has to be very careful about how she
14    speaks to her daughter.
15            THE COURT:  All right.  Thank you.
16        The Court has obviously received and reviewed the
17    presentence investigation report prepared by Agent
18    Langbecker.
19        Mr. Dirks, my assumption is you've reviewed that and
20    there are no other corrections outside of that
21    correction; is that correct?
22            MR. DIRKS:  I've reviewed it, and there are no
23    other corrections.
24            THE COURT:  Mr. Raff, have you had a chance to
25    review the PSI with your client?  If so, are there any

002347

1   corrections from your perspective?

2          MR. RAFF:  Yes.  I reviewed it.  No -- no

3   corrections.

4          THE COURT:  Thank you.

5      The maximum penalties the Court could impose with

6   regard to this offense is a fine of not more than

7   $100,000 and up to forty years in the Wisconsin State

8   Prison System.  The maximum period of initial

9   confinement the Court could impose is not more than

10  twenty-five years.  The maximum period of extended

11  supervision the Court could impose is fifteen years.

12  And obviously the maximum period of probation is

13  twenty-five years.

14     The Department of Corrections is recommending that

15  the Court impose a sentence of nine to ten years of

16  initial confinement followed by three to four years of

17  extended supervision with a number of conditions of his

18  extended supervision that I'll not get into right now.

19     Are there any witnesses for either the State or the

20  defense that wish to address the Court?

21         MR. DIRKS:  I'm not calling any witnesses, Your

22  Honor.

23         MR. RAFF:  No.

24         THE COURT:  Mr. Raff?

25         MR. RAFF:  No.

                            4

1          THE COURT:  Very well.

2     Then at this point in time, the Court will hear the

3     State's position with regard to sentencing.

4          MR. DIRKS:  Thank you.

5     Your Honor, I'm largely in agreement with the

6     department's recommendation.  Under the terms of the

7     parties' plea agreement, I am confined to a

8     recommendation of no more than ten years of initial

9     confinement and ten years of extended supervision, and

10    that is my recommendation.  There are a number of

11    reasons for that.

12         First of all the gravity of this offense cries out

13    for a long prison sentence.  The defendant who was -- I

14    think he was sixty-two years old when this all began

15    encountered a vulnerable child, a fourteen-year-old girl

16    who didn't have a father in her life who -- at least in

17    her mother's judgment, and I think it's true -- really

18    needed a father figure.  And like a lot of

19    fourteen-year-olds, she wanted to be involved in a

20    romantic relationship.

21         The defendant presented himself to a lot of people

22    as a very prosocial member of the community.  He'd been

23    a Beloit police officer for quite a number of years.  He

24    worked as a security guard at the library, at schools.

25    He was really looked up to by a lot of people in the

002349

1      Beloit community.  And the victim's mother knew who he

2      was and saw him as a very admirable person.  And when he

3      offered to be a kind of father figure or male mentor for

4      her fourteen-year-old daughter, she thought that was a

5      great idea.  It is often the case that people who are

6      pedophiles put on a public face as somebody who's very

7      respectable.  And part of the reason that they can do

8      what they do is because of that public face, and that's

9      exactly what happened here.

10      This went on for months.  It only stopped because

11      the victim's mother was checking the victim's phone --

12      actually it was the mother's phone and found a video of

13      the defendant and her daughter in their underwear

14      apparently in a motel room.  She did exactly what we

15      would hope a mother would do and called the police.  And

16      that's the only thing that put a stop to this.  This

17      would have gone on for who knows how long had it not

18      been discovered.

19      In doing what he did, the defendant has not only

20      done grave harm to the victim, he's also harmed his own

21      family.  The victim still -- because I've met with her a

22      couple of times -- sees the defendant as her boyfriend.

23      And she's distraught that she's been separated from him

24      by his bond conditions.  It's going to take -- I mean

25      let's think about that for a minute.  This

002350

1      fourteen-year-old girl saw this as a romantic

2      relationship with somebody who's easily old enough to be

3      her grandfather.  And even after the charges had been

4      filed in this venue and in federal court, even after

5      everything that's happened, she is still distraught that

6      she can't be with him.  It's going to take that kid

7      years -- if ever -- before she can finally overcome

8      this.

9           The Court heard me in a sentencing hearing a couple

10     of weeks ago and heard from two people in their twenties

11     who described to the Court years after the fact the

12     trauma that a lengthy period of repeated sexual assault

13     had worked on them.  I'm hopeful that the victim in this

14     case will move from viewing this as a romantic

15     relationship and come to see it for what it was which is

16     a series of sexual assaults.  She was taken advantage

17     of.  And that's -- you know, that's an old euphemism for

18     sexual assault, but it -- it aptly applies here.  She

19     was taken advantage of by this man who presented himself

20     as a pillar of the community and used that position in

21     order to take advantage of her.

22          And he's not only done grave harm to the victim and

23     her mother, but he's harmed his family.  He was the sole

24     source of support for his wife and according to the

25     presentence report for most of his adult children as

1     well.  Because of his incarceration, he can't receive

2     social security anymore.  And so they don't have that

3     source of support.  They're living on what's left of his

4     pension which is $2,000 a month.  The home's been

5     foreclosed on.  The defendant's wife never worked

6     outside the home.  She's got no job skills.  She's going

7     to have to try and find employment somehow to keep a

8     roof over her head and body and soul together.

9         But what makes this a particularly aggravated crime

10    on top of all of that is that the defendant completely

11    refuses to accept any responsibility whatsoever for what

12    he's done.  Reading from page 5 of the presentence

13    report, he told this writer "since this all happened, I

14    felt like the so-called victim put something in my water

15    bottle, and it is Aquafina, the kind of water that I

16    drink; that was once in the alleyway of her house, and

17    it happened another time at a hotel we were at; it was

18    just a funny feeling after I drank the bottle of water;

19    she knew I was a big bottled water drinker; but the one

20    time in the alley, I noticed the water was really

21    cloudy, and I asked her because it tasted so bitter; she

22    said nothing and that she had just opened it up; I

23    noticed that at two of the hotels we were at, I had

24    bottled water that she had brought with; I sort of

25    noticed something was in it, but I still drank it."

002352

1    Going on, when asked if he had ever had sexual
2    intercourse with the victim, his response was "maybe
3    kissing around the neck or "maybe around the breasts,
4    something like that."  When asked if he'd ever digitally
5    penetrated her, the defendant replied not that I can
6    remember.  When asked if he'd ever performed oral sex on
7    her, he stated um, they say I did; I think my memory
8    probably wouldn't have been clear around that time
9    because of the water; and I know it's on tape; so I
10   can't really deny it, but I don't remember doing
11   anything like that.  When asked if he'd performed oral
12   -- she had performed oral sex on him, the defendant
13   responded "let's see; yeah; they said I did; they said
14   it was on tape too, but I don't remember doing that.
15   Regarding the frequency of his sexual contact with G,
16   the defendant estimated it was "little to none."  He
17   took her to hotel rooms all around the state line area
18   to have sex with her.  He had sexual contact with her
19   hundreds of times.  And his response to all of that is
20   well, she put something in my water; it's her fault.
21       He also says that the district attorney wants to
22   slam me for a lot of time; in this state, black men are
23   incarcerated more heavily sentence-wise than white men,
24   and that's what I feel this is slipping into.  So Mr.
25   Woods is the victim here.  The girl put something in his

002353

1    water.  The district attorney who's white and I'm black

2    wants to incarcerate me because of my race.  I'm getting

3    tired of that argument.  It has nothing to do with race.

4    And it's an accusation that I can't defend myself

5    against because I can't disprove it.  Mr. Woods doesn't

6    know me.  He certainly doesn't know me well enough to

7    make an argument like that.

8    He also goes on to state regarding the victim "I

9    hope she can straighten her life up and not catch other

10    people up in situations like this."

11    Your Honor, given the gravity of this offense, the

12    length of time that this went on, the number of times he

13    assaulted this child, the way he warped her mind, given

14    the fact that he took advantage of his position in the

15    community to find such a vulnerable victim, and given

16    his total, total lack of acceptance of any sense of

17    responsibility here -- in fact -- blaming the child for

18    what happened here, I think the lengthy sentence that

19    I'm asking for is appropriate.

20    Thank you.

21    THE COURT:  Thank you.

22    Mr. Raff.

23    MR. RAFF:  I think we can start from the

24    proposition whereby I agree with the district attorney

25    in that this is -- that the gravity of this offense is

002354

1      serious, that it should require the Court -- and I think

2      that the Court should sentence Mr. Woods to a lengthy

3      period of incarceration as Mr. Dirks stated.  I think

4      that's true, and I think that I agree with that.  But

5      I'm going to ask the Court to sentence Mr. Woods to five

6      years initial confinement and five years extended

7      supervision which under these circumstances considering

8      the gravity of the offense, what actually happened, and

9      Mr. Woods' life is an appropriate sentence.  That does

10     everything that the Court should hope that a sentence

11     would do in this situation, and that very adequately

12     punishes Mr. Woods for this behavior.  Five years in

13     prison for somebody who's never been involved in the

14     criminal justice system on this side of it obviously is

15     a lot of time.

16         And as I'm sure the Court's also aware, he's facing

17     a sentencing in federal court for essentially the same

18     behavior as it was charged federally for him essentially

19     crossing state lines and engaging in the same behavior,

20     the driving.  And for that, he does face a mandatory

21     minimum period of incarceration of ten years.  So

22     whatever we do here, after this sentencing hearing on

23     November 6th, Mr. Woods is going to be taken to federal

24     court, and he's going to do this again.  He's going to

25     hear the same facts again, and he's going to be

002355

1    sentenced on the same thing.  And he's going to get at
2    least ten years, and that's mandatory.  So to address
3    these state charges with five years in and five years
4    out is appropriate.  And it's appropriate for several
5    reasons.  Because I don't think anybody is questioning
6    as we sit here today that this hearing isn't about
7    whether or not Mr. Woods did something bad.  And okay;
8    if we can start from that proposition then fine.  Where
9    should -- where does this crime fit on the spectrum of
10   things that people do that are bad?  And it's not the
11   least bad thing, but it's not the most bad thing ever.
12   And it's hard to say that.  It's a weird thing to say or
13   to argue, but it's not.
14        Mr. Woods is a person who is sixty-three.  At
15   twenty-two, he joined the police force.  And he
16   essentially worked for the Beloit Police Department for
17   I want to say twenty-five years.  He retired when he was
18   fifty-one.  During that period of time, he was a model
19   citizen in Beloit.  He was somebody that the black
20   community in Beloit looked up to.  He was a black police
21   officer policing Beloit which is something that we
22   probably need more of.  And he did a good job at that.
23   And during that time, there were -- there were no
24   issues.  There were no instances of him taking advantage
25   of his position, doing things inappropriately, getting

12

002356

1    written up, getting in trouble.  He was a model police

2    officer.  And I don't think anybody could come in and

3    make a claim against that.

4        And at the same time or afterwards, he still tried

5    to help the community that he'd been a part of since he

6    was twenty-two.  He worked in situations involving

7    children.  He worked at the high school, at the middle

8    school as a resource officer.  He worked security at the

9    library.  He worked closely with the Beloit Explorers

10   which is a youth group connecting youth and police.  And

11   during all of that time, there's -- there's no

12   allegations.  There's no misconduct.  There's nothing.

13   So that's sixty-two years of being a good dad, of being

14   a good police officer, of interacting with children in

15   an appropriate way.  This isn't a situation where Mr.

16   Woods has been an undercover pedophile for sixty years

17   setting up his life and arranging things in a way in

18   which he could finally strike and -- and have this

19   victim and have all the stars align where he can take

20   advantage of this person based on -- on how he set up

21   his life.

22       He screwed up in a very large way and in a very

23   serious way that as Mr. Dirks said has a huge impact on

24   this girl for the rest of her life, on this girl's

25   mother and their greater extended family I'm sure, and

002357

1    on Mr. Woods' life.  And that's something that he does

2    need to sit here and take responsibility for and that he

3    pled guilty to and that he acknowledged and that he's

4    here to be sentenced for.  And -- and whether he's given

5    a five-year sentence as I'm asking or a ten-year

6    sentence as the State's asking, we're looking into

7    putting him in custody into his late sixties or early

8    seventies plus whatever time he gets in federal court.

9    It's enough time which I think is appropriate -- and

10   that's part of why I'm asking for five because it -- it

11   would allow the victim in this case who -- who is a

12   victim whether she thinks so right now or not.  She is a

13   victim, and it would take -- he would be incarcerated

14   until she was in her twenties, until she was hopefully

15   old enough to have had other life experiences, to grow

16   up a little bit, and to recognize what's been done to

17   her, recognize the negative effects this could have on

18   her life going forward if she doesn't right now.  And

19   that's a shame, and that's one of the things that Mr.

20   Woods needs to pay for.  And so I think putting him in

21   custody for that five years would allow her to have some

22   closure and recognize her role as a victim in this

23   situation and to hopefully not take it lightly.  And I

24   don't -- I don't want to tell a victim they should get

25   into therapy, but like if that's something she needs to

14

1    do to be able to recognize that and address that while

2    Mr. Woods is in custody, I think that would be

3    appropriate.  So the length of time that he's going to

4    be in custody should allow her to -- it should be enough

5    that she should recognize her role as the victim in

6    this, and I think that that's important.

7        But at the same time, ten years would put Mr. Woods

8    at seventy-three, a very old man.  And when we sit here

9    today and when we listen to the arguments of the State,

10   it almost -- it feels in a weird way -- and maybe this

11   is how the Court sees it too -- but that the amount of

12   time that Mr. Woods has been a good, solid, productive

13   member of the community -- because he's demonstrated how

14   nice and good and solid of a person he is -- that when

15   this sort of crime occurs that that is then flipped on

16   him in a way where we say he should have known better

17   even more than everybody else, and therefore it's worse.

18   And that's true, and that's why I think we're coming in

19   here on a first offense sexual assault type crime and

20   asking for straight-up prison because that doesn't

21   always happen.  We come into court, and sometimes

22   different circumstances require probationary sentences.

23   And I'm not saying that this is those because it's not.

24   It's different.  But to -- to take sixty-two years of

25   positive, productive community living and to then use

002359

1    that against Mr. Woods to the tune of ten years seems

2    excessive.

3         In those five years that he would be in custody, he

4    could engage in any treatment, any sex offender

5    treatment that he obviously should be required to do,

6    hopefully criminal thinking, hopefully cognitive

7    behavioral therapy and be forced to recognize his role

8    in this.  Because if -- if you look at the PSI,

9    obviously it's clear that's not -- and what -- that it's

10   not quite exactly the PSI that I'm sure the Court would

11   have liked to have seen in this situation.  I'll put it

12   that way.  Some of his responses when pulled out -- and

13   I don't know the entirety of the conversation, but I've

14   spoken with Mr. Woods about this case a lot.  And we

15   haven't had discussions that -- in which he attempted to

16   blame the victim.  We haven't had discussions in which

17   he attempted to say that nothing happened because it

18   did.  And -- and from the first time I sat down with him

19   when I was his lawyer, we were talking about when he was

20   going to plead guilty because he was going to accept

21   responsibility, and he was ready to come in and do that.

22        And when you -- he sits down with the PSI writer,

23   the way he described it to me when we looked at -- at

24   this PSI and I was like what are these comments, he made

25   it seem to me that he -- when he thinks about this time

16

1       where he was engaging in this -- for lack of a better

2       word -- relationship with this girl, he was out of his

3       mind.  He can't believe that that's what he did.  He

4       doesn't know why he did this.  That's -- I don't think

5       that's a crazy thing to think.  How could I possibly

6       have done that?  I know that I did that; it's on tape;

7       yeah; I can't say I didn't; I don't remember it

8       specifically.  That's what he said.  Maybe it's because

9       he's blocking it out of his mind.  I don't know.  But he

10      knows that it happened.  He knows that he took advantage

11      of her, and he pled guilty.  And whether he's searching

12      for a reason, whether he's -- you know -- looking to

13      excuse his behavior at least in his own mind for the

14      time being, I don't know.  But he hasn't conveyed it to

15      me that way in the past.

16          And when -- and I can understand from his

17      perspective sitting down there in the Dane County Jail

18      and speaking with a -- with a probation officer who

19      you've not met with before and have not spoken with

20      being forced to defend this behavior to somebody that

21      you don't know -- or not defend the behavior but at

22      least come up with an explanation, sir.  And -- and I

23      mean Mr. Woods hasn't been in this situation before.  He

24      doesn't know why he did this.  It was a bad thing that

25      he did, and it was -- and he did -- like Mr. Dirks said,

002361

1    he took advantage of the situation.  He took advantage

2    of a vulnerable girl who needed a father figure.

3        But as I said before, Mr. Woods has been around

4    vulnerable girls who've needed a father figure for the

5    last forty years, and nothing like this has ever

6    happened.  So to him, he still can't believe that he did

7    this.  He ruined his -- the rest of his wife's life.

8    He'll acknowledge that.  His kids will never think about

9    him the same.  He has ruined his own life obviously, the

10    rest of it.  He's ruined this girl's life.  He's ruined

11    this girl's mom's life.  And for that, he can't do

12    anything.  He can't take it back.  He can't change how

13    things unfolded.  And he doesn't know why at

14    sixty-three years old he did that.  And that's a shame,

15    and that's a -- a real thought.  And when it -- when he

16    said he knows her as a liar, there are certain things

17    that she has embellished in this situation.  And -- and

18    whether that was pulled out of context by the DOC

19    writer, that's what he was referencing.  He wasn't

20    saying she was completely lying about this whole thing.

21    That's the explanation for that comment.  There are --

22    there have been things over the course of this case that

23    he doesn't necessarily agree with but that don't change

24    the fact that he did engage in this sexual behavior with

25    her.  And at the end of the day, that's why he pled

002362

1          guilty.

2              So my recommendation is -- it is the same result

3          that the State thinks is appropriate.  It's to sentence

4          somebody for what they did to a lengthy period of

5          incarceration, to sentence Mr. Woods for taking

6          advantage of a fourteen-year-old girl and engaging in a

7          sexual relationship which she legally and factually was

8          not ready for obviously.  And for that, he should pay.

9          But at the same time, I -- my recommendation of five in

10         and five out accounts for a couple things that I feel

11         that the State's ten in and ten out does not.  And

12         that's a recognition of the positive things that Mr.

13         Woods has done over the last sixty years, the fact that

14         he hasn't done drugs, hasn't done alcohol.  He's just --

15         he's been a regular guy like he's just a regular person,

16         model citizen.  And to put that into the context of what

17         risk will he pose when he gets out and to protect

18         society in the future when he does get done with this

19         sentence and the federal sentence and have his probation

20         and be a sex offender, he'll -- he'll be dead by the

21         time those things are done.  And so the risk to society

22         and the risk to the public in my opinion is low based on

23         all those other factors.

24             And to also put into perspective the actual crime,

25         that it -- it was not a very young child.  It was a

002363

1    young child.  It was illegal.  And that it was not

2    factually violent.  And I tread lightly saying that

3    because I know how the Court will respond to that, but

4    that's -- those things are true.  She couldn't agree to

5    this relationship and she shouldn't be able to.  And we

6    know why the law exists, and it makes sense.  But it --

7    it wasn't forceful.  It wasn't violent.  So my

8    recommendation is for five in and five out based on

9    those things.

10          THE COURT:  Thank you.

11       Mr. Woods, is there anything that you'd like to say

12    to the Court before we proceed this morning?

13          MR. WOODS:  Your Honor, I made a statement about

14    responsibility -- about me taking responsibility like

15    Mr. Raff just said, and I'd like to read that to the

16    Court real quick.  I want the Court to know that I'm

17    very sorry for my actions regarding the charges.  I

18    deeply apologize to the victim and her family in this

19    case.  I truly would pray that the victim can move on in

20    her life to be a successful young lady in her long life

21    to come.  I am also sorry that I brought shame to my

22    wife and my family.  I love all of them very much.  No

23    one would really know the pain that's in my heart right

24    now going through with this at this time in my heart.

25       All of my life I have tried to be a good citizen

20

1      growing up in the inner city staying away from drugs,

2      alcohol, and bad people.  I know why I'm in this

3      situation because I made some bad choices in my life

4      which led me to get in this trouble.

5          What I would like to convey to the Court is that I'm

6      asking for a second chance in my life to make a

7      difference, to give something back that's positive.

8      Upon serving my time, I would like to be a chaplain in

9      the prisons, jails, and so on.  And I hope that I can

10     bring some hope through Jesus Christ for those who have

11     lost hope in their life.  I pray that the Court have

12     mercy on me at this time.  And to end it, I'd like to

13     say thank you to the Court, and may God bless you all.

14          THE COURT:  Thank you.

15     Is there anything further from the State or the

16     defense?

17          MR. DIRKS:  No, Your Honor.

18     Thank you.

19          MR. RAFF:  No.

20          THE COURT:  Very well.

21     Well, as I've indicated, I have reviewed the

22     presentence investigation report.  I've certainly

23     reviewed everything that's been filed with the Court as

24     I referenced earlier.

25     Mr. Woods, as you well know given your prior

21

1    occupation, my obligation is to try to achieve a number
2    of objectives with regard to sentencing, and that
3    applies to every individual that sits in the seat that
4    you're currently occupying.  Those objectives are
5    protection of the community, punishment, rehabilitation,
6    and specific deterrence.  And to achieve those
7    objectives, I take into consideration a great number of
8    facts and circumstances many of which have already been
9    referenced by the attorneys.  But I break those facts
10   and circumstances into three general categories that I'm
11   going to go through here in detail.  Those facts relate
12   to the seriousness of the offense, the history and
13   character of you, the offender, and finally the needs of
14   our community which certainly include the needs of the
15   victims.
16        When I look at the seriousness of the offense, I
17   always begin sentencing hearings outlining the maximum
18   penalties because that certainly suggests the
19   seriousness of the offense, the gravity of the offense
20   if you will.  And as Mr. Raff points out, when we look
21   at these types of penalties, we look at the spectrum of
22   criminal behavior, and where does this fit?  This is a
23   Class C felony.  There are only two more felonies that
24   are more serious in the eyes of the citizens of this
25   state.  So this is nothing but a serious offense as far

002366

1    as I am concerned.  There is no mandatory minimum.  An

2    editorial comment here, I think it's somewhat crazy in

3    the State of Wisconsin that we can have mandatory

4    minimums for the possession of child pornography, but

5    when someone lays hands on a minor child, there's no

6    mandatory minimum.  But that's the law.  And I'm bound

7    to follow the law.

8         Next I look at the details of the offense because

9    that certainly sheds light on the seriousness of the

10   offense.  This is as Mr. Dirks pointed out a situation

11   where the mother of this victim reported seeing evidence

12   of a sexual relationship between Mr. Woods who she knew

13   and her daughter knew, and she found evidence of this on

14   a cell phone.  I might add that the victim was thirteen

15   years of age at the time that this was discovered.  The

16   officers observed several videos confirming the sexual

17   conversations and inappropriate physical contact

18   involving kissing and touching.  The victim, herself,

19   reported engaging in sexual intercourse two to three

20   times in a hotel in May of 2018.  She reported engaging

21   in oral sex over 100 times at hotels and in Mr. Woods'

22   vehicle.  She reported that Mr. Woods told her not to

23   tell anyone.  She obviously reported that the two had

24   stayed at several motels including Baymont Suites,

25   Quality Inn, and Super 8 in the Beloit and Rockford

1    areas.  She also reported digital penetration.

2         Based upon all this information, we understand why

3    officers would arrange for a SANE exam.  And fortunately

4    there were no physical injuries that were reported.  But

5    the victim did report to that SANE nurse being sexually

6    active with Mr. Woods.  The officers were able to

7    confirm that Mr. Woods had -- in fact -- been staying at

8    a number of motels as the victim reported.  Motel staff

9    recalled Mr. Woods checking in with his "daughter" but

10   with rooms that contained only a single bed which seemed

11   odd to them.

12        I've reviewed the victim impact statements because

13   obviously the effects of this kind of behavior, conduct

14   on the victims and the victims' families is important

15   and significant for the Court to take into

16   consideration, and it speaks to the seriousness of the

17   offense.  It's the consequences of your behavior on

18   other people.  The -- the father of the victim certainly

19   noted experiencing depression from the fact that this

20   has further complicated the victim's life who was

21   dealing with other losses in her life.  That father

22   wants the Court to consider a significant fine, a period

23   of confinement, counselling, etc. The mother of this

24   child who filed not only a victim impact statement on

25   behalf of the child but also her own victim impact

002368

1    statement indicates how angry that the child is.  And I

2    certainly noted the extra comments that Mr. Dirks added

3    to the PSI.  But the mother reports how the victim is

4    very guarded.  She has trust issues not only with her

5    parents over the reporting of this incident because she

6    does apparently have this twisted view of her

7    relationship with Mr. Woods.  And the mother reports

8    that this victim's going to need extensive therapy.

9    That's understandable, and I agree with that.  The

10   victim has been unable to attend summer school due to

11   some cruel comments from other children on social media.

12   And as far as the mother is concerned, Mr. Woods needs

13   to be sitting in prison.  He needs counselling, and he

14   needs to be held financially responsible for the

15   counselling that this child needs.  That's something

16   that's difficult to achieve for someone sitting in the

17   Wisconsin State Prison.

18       Obviously there -- as I indicated, there have been

19   no physical injuries that we know of, but the emotional

20   trauma cannot be understated.  The effects that I just

21   outlined that the victim's family has noted are in

22   addition to the comments from Mr. Woods' family.  And I

23   have too noted all of those comments by his wife

24   including the fact that the family is shocked, angry,

25   forced to move and leave their house that they've lived

002369

1    in for many years, leave their community, their church,
2    their friends.  I've also noted the comments that this
3    carries a great deal of shame that Mr. Woods brought
4    upon his own family and her comment about after all
5    these years of marriage, the shock that she's
6    experiencing that this person would pull off something
7    this crazy with this young girl.  I can -- I can
8    appreciate the fact that your wife is in complete and
9    utter shock, the financial devastation obviously that
10   Mr. Dirks referenced, and the fact that -- as Mr. Raff
11   points out -- your conduct here has ruined a great
12   number of lives.  And all of that speaks to the
13   seriousness of this offense.
14        You did -- in fact -- take advantage of this very
15   vulnerable child.  Thirteen and fourteen-year-old
16   children don't have the emotional maturity to deal with
17   relationships period, let alone a physical relationship.
18   With what we know about the development of the human
19   brain and the fact that these -- that our brains aren't
20   fully developed until we're in our twenties suggests the
21   seriousness of this offense as far as I'm concerned
22   because you engaged in this kind of conduct with a
23   thirteen-year-old child.  And I want to respond to the
24   remarks about how this victim still sees Mr. Woods as
25   her boyfriend.  The nature of this romantic relationship

26

1    certainly highlights how warped her perspective on

2    things is based upon your conduct.  I'm troubled every

3    time I get a letter from a child victim who turns --

4    well, who reaches the age of majority.  And I've had too

5    many letters that I've received from now adult victims

6    who want to have contact with the person who assaulted

7    them when they were a child.  What that highlights in my

8    mind is the fact that these children don't get the

9    treatment that they obviously need, that the impact of

10   that behavior on them is lifelong.  And that highlights

11   the seriousness of this type of conduct in my mind.

12       Before I move on to the history and character of Mr.

13   Woods, I too was struck by Mr. Woods' version of events.

14   And I -- I highlighted and echo -- I'm going to echo

15   some of the same sentiments that Mr. Dirks pointed out

16   and that Mr. Raff also pointed to.  The comments about

17   the victim allegedly putting something in your water

18   bottle, that you don't remember doing certain things,

19   and that the sexual contact was little to none is

20   insulting to one's intelligence given all the evidence.

21   And I appreciate the attempt to try to explain perhaps

22   your attempt to try to rationalize or figure out why you

23   did what you did, but it certainly doesn't look that

24   way.  It doesn't sound that way when you make those

25   types of comments.

1          And I too was troubled by the comment about black

2     men being sentenced more heavily than white men.  And

3     it's unfortunate I've had to hear that type of an

4     argument in a sentencing hearing twice in the last few

5     weeks.  When I read the criminal complaint, I have no

6     idea what the race of the person who's identified in

7     that complaint is.  When I read a PSI, I have no idea

8     what the race of the person is.  It's not a factor that

9     ever comes into consideration under Gallion.  It's not

10    an appropriate factor for this Court to take into

11    consideration.  And to suggest that it does is

12    insulting.

13         I also highlighted the comments about the victim

14    being a "big liar" and the comment further that the

15    victim's mother knew I was out with her.  That just

16    highlights how much more troubling this behavior is as

17    far as I'm concerned.

18         And then I too was troubled by your response when

19    you were confronted with the 21 videos that were

20    recovered or were reviewed on the victim's Periscope

21    account which is an app apparently that lets someone

22    share live streaming video from a cell phone -- a cell

23    phone or a smart phone or a tablet.  And it highlights

24    the problems associated with having -- allowing young

25    children to have access to that type of technology.  But

002372

1    on pages 9 through 13 is where the transcript of those
2    videos is outlined and highlighted highlighting the
3    kissing, the sexual content of the discussions that were
4    engaged in in your presence with this thirteen-year-old
5    child, her references or comments about getting married
6    and engaging in love games, having babies, the two of
7    you giving instructions to one another about sexual
8    activity, and then your grabbing this child over the
9    clothing in inappropriate places, the threats to the --
10   from you to the victim telling her not to tell anyone,
11   the comments about having sex on weekends.  I can't
12   imagine any adult thinking any of that is an appropriate
13   conversation to have with a thirteen-year-old child.
14   It's disgusting.  And that all highlights the
15   seriousness and the gravity of the offense as far as I'm
16   concerned.
17        Next I'm going to move on to the factors that speak
18   to the history and character of you, the offender, Mr.
19   Woods.  You are sitting before this Court as a
20   sixty-three-year-old gentleman.  You're an educated
21   gentleman, a high school graduate.  You've had some
22   college credits.  You obviously completed the law
23   enforcement academy at Blackhawk Tech, did some further
24   training at MATC.  And obviously you have completed
25   field training and some of the officer programming to be

002373

1    a law enforcement officer.  Obviously I note your

2    employment history, twenty-five to thirty years as a law

3    enforcement officer, retired, working as a security

4    guard at Aldrich Middle School and at the Beloit library

5    in your most recent past.  Your health is certainly a

6    factor as well.  I understand that you are

7    self-diagnosing yourself with PTSD.  I'm not sure where

8    that comes from.  Obviously we have other health issues

9    that are very consistent with being sixty-three years of

10   age.

11      I certainly wouldn't have expected to see any

12   criminal record, and there is none other than this case

13   here and the pending case that is in federal court which

14   I understand you are due to be sentenced on next month

15   and -- strike that -- in November.  Excuse me.  And I

16   certainly understand that there's a mandatory minimum

17   that will follow a conviction in that -- in that matter.

18   You've never been on probation before.  There's never

19   been any AODA issues that have been brought to the

20   Court's attention in the PSI.  You've obviously been

21   married for forty years, have 11 children.

22      And I agree with Mr. Raff.  By all accounts, you've

23   lived a stellar life.  You've helped the community in

24   many ways.  And Mr. Raff is right.  He's heard me

25   comment in enough sentencing hearings to know that

002374

1      that's what I'm going to say makes this that much more
2      shocking not only to me, but this kind of conduct shocks
3      the conscience of the entire community.  When someone
4      who's been in law enforcement, a trusted member of our
5      society engages in this kind of conduct, you are
6      betraying the trust of the entire community not only the
7      trust of this thirteen-year-old child and not only the
8      trust of that child's mother and father.  What mother
9      and father would think that their child's at risk being
10     in the presence of a retired police officer of
11     twenty-five to thirty years?  No one would.  And you
12     betrayed all of that trust by engaging in this -- this
13     conduct.  I hesitate to even classify -- characterize
14     this as a relationship.  It's offensive to the whole
15     term relationship to be quite honest with you.
16         Certainly your demeanor is something that I have to
17     try to evaluate.  It's difficult to evaluate that from
18     the written word, but we make the best attempt at doing
19     so. I have to try to determine whether or not you are
20     remorseful because it's very easy to say the right
21     things.  And you've been a police officer for a long
22     time.  You know the right things to say.  You're the
23     only person in this room that knows what's really in
24     your heart.  But that's what makes some of the comments
25     I referenced earlier about the victim and your behavior

002375

1     and your comments here today about taking

2     responsibility -- I noted on page 27 of the PSI your

3     comments about your good past record, always helping

4     others, stating that this was wrong, and that you're

5     blaming no one else and taking responsibility.  It

6     echoes your written statement that you read to the Court

7     here today.  But I cannot help but say -- or conclude

8     that this is very inconsistent with the responses to the

9     videos and your characterization of the victim which

10    certainly suggests that you're not taking responsibility

11    and that you are -- in fact -- minimizing your conduct.

12    I thought the author of the PSI stated quite succinctly

13    on page 33 of the PSI which she concluded after looking

14    at all the same information that I'm looking at that you

15    are "unwilling to take responsibility for your behavior,

16    and you are even bold enough to claim race will play

17    into your upcoming sentencing; that comment was just

18    another example of how the defendant shifts blame

19    instead of owning his conduct."  And that's exactly the

20    way it looks.  The agent concluded that you have this

21    sense of entitlement.  You attempt to rationalize what

22    was going on.  You're blaming the victim which is

23    certainly what it sounds like.  The dishonesty, the lack

24    of remorse that is readily apparent, I can't overlook

25    that as well.  I also note the comments that the author

002376

1      made on page 33 as well about how you were socially

2      accepted by the community; however, those attributes are

3      exactly what make the defendant's actions even more

4      unbelievable and of concern.  You were a prosocial

5      member of the Beloit community, and you betrayed the

6      trust of nearly everyone.  I agree 100 percent with

7      those sentiments.  But all of this is -- like I said --

8      what makes your conduct that much more shocking to

9      everyone here.

10          Next I look at the needs of our community.  Are you

11     a good risk?  Well, by Mr. Raff's own comments with

12     regard to your position about you searching for why you

13     did what you did certainly suggest that you're not a

14     good risk.  You haven't been in any treatment.  And

15     quite frankly you still present a significant risk to

16     not only this victim but the entire community.  And as I

17     indicated earlier, the risk to the victim is certainly

18     part of what I have to consider when I look at the needs

19     of our community.  The fact that she may still be

20     looking at you as a boyfriend, as a father figure well

21     into her adulthood suggests the -- the risk that you

22     present, and it also highlights the damage that you

23     caused.  And because of the fact that this victim and

24     her family have fallen on the economic hard times that

25     they've fallen on, I'm not convinced that this victim's

33

1    going to get the counselling and the treatment that she

2    needs.  Obviously the entire community needs protection

3    from people who engage in this kind of conduct.  And the

4    entire community certainly expects that someone who was

5    privileged to be an officer for as long as you've been

6    privileged to be an officer and serve the community --

7    you've betrayed that trust, and the community certainly

8    needs protection.

9        My obligation is to try to impose a sentence that

10   deters you from continuing down this path of

11   destruction.  There's obviously also a moral need for

12   punishment associated with conduct of this nature.  And

13   it is based upon all those facts and circumstances that

14   I've taken into consideration, that I've highlighted --

15   and it's obvious to everyone in this room -- that

16   probation is certainly not an appropriate disposition.

17   No one is asking for it.  Confinement is obviously

18   necessary to protect the public.  You are in need of

19   significant correctional treatment which can be provided

20   in a confined setting, and that's where it's going to

21   occur.  And certainly it would depreciate the

22   seriousness of this offense to do anything other than

23   sentence you to a period of incarceration.  The real

24   question here is what is that appropriate period of

25   incarceration?

34

1       And I appreciate the arguments about Mr. Woods being

2   a sixty-three-year-old gentleman and trying to evaluate

3   and assess the risks.  As Mr. Dirks is well aware, I

4   sentenced someone who was quite a bit older than you

5   just a couple -- just a week or so ago to a much

6   lengthier period of incarceration than what's on the

7   table here at least in terms of what the State is

8   arguing for and what the Department of Corrections is

9   recommending.  The facts and circumstances of that

10  gentleman's case are very different from yours.  He was

11  a repeat sexual offender.  But to suggest that someone

12  at age sixty-three does not present a risk to society is

13  essentially sticking one's head in the sand.

14      So I've struggled with trying to determine what's an

15  appropriate sentence in this situation.  I've had time

16  to review obviously the PSI for some time, and I'm

17  trying to determine what's an appropriate sentence to

18  not only achieve all the objectives of sentencing which

19  include rehabilitation for you as well, and it's not a

20  simple task.  But what I think is an appropriate

21  sentence in this case is as follows.  I'm going to

22  sentence you to twelve years of initial confinement in

23  the Wisconsin State Prison System.  That's going to be

24  followed by five years of extended supervision.  And the

25  reason why that five years of extended supervision is

1    appropriate as far as this Court is concerned is because

2    I know you're going to get some -- some treatment in a

3    confined setting.  And you're going to be afforded the

4    opportunity once that prison sentence is completed to

5    demonstrate that you can conform to the laws of a

6    civilized society and demonstrate your rehabilitation

7    during that period of extended supervision.  Because if

8    you don't or if you can't, you will not come back to see

9    me.  You'll go directly to prison and serve out the

10   remainder of that time.

11       The conditions of your extended supervision are

12   going to be that you participate in any further

13   recommended assessments and treatment or counselling

14   deemed necessary by the department, that you pay your

15   court-ordered financial obligations and supervision

16   fees.  You are going to be required to register as a sex

17   offender and comply with the sex offender treatment

18   requirements as well.  I am going to require that you

19   maintain no contact with the victim or the victim's

20   family, no contact with any children or minors without

21   agent approval, and I'm going to require that you not be

22   near any locations where minors or vulnerable

23   populations congregate namely parks, schools, day care

24   providers, or businesses servicing those populations

25   without agent approval.

002380

1              You are not eligible for the challenge incarceration

2       program not only because of your age but also because of

3       the child sex offense under Chapter 948.  And you're not

4       eligible for any substance abuse programming or earned

5       release programming as well.

6          Counsel, has there been any discussion or agreement

7       with regard to the amount of sentence credit he's

8       entitled to?

9              MR. DIRKS:  I think we're in agreement it's

10      seventy-four days.

11             MR. RAFF:  Yes.

12             THE COURT:  The judgment will provide for

13      seventy-four days of sentence credit.

14         Mr. Dirks, I certainly appreciate the fact that the

15      victim -- the mother of the victim was making claims of

16      requests for restitution.  Is there any formal request

17      for restitution here?

18             MR. DIRKS:  There is.  There was a request in

19      the amount of $35.51 which has been paid by the Crime

20      Victim Compensation Program.  And I'd ask that the Court

21      order restitution in that amount paid by the defendant

22      to CVC.

23             THE COURT:  So ordered.

24             MR. DIRKS:  Thank you.

25             THE COURT:  Is there any other restitution?

002381

1          MR. DIRKS:  No.

2      But there is also a request for an order for HIV

3  testing which I can file with the Court.

4          THE COURT:  Very well.

5      The Court will sign that order for HIV testing.  I

6  think that's certainly appropriate under the statutory

7  provisions.

8      Mr. Woods, it's my obligation to inform you that you

9  have been convicted of this felony.  That means you are

10  not permitted to vote in any election until your civil

11  rights are restored.  You are not permitted to possess a

12  firearm at all.

13      The restrictions for child sex offenders under

14  Chapter 973 apply to you.  Do you understand that, sir.

15          MR. WOODS:  Yes, sir.

16          THE COURT:  Mr. Raff, you'll go over your

17  client's appellate relief rights as well as the written

18  explanation of determinate sentencing; is that correct?

19          MR. RAFF:  Yes.

20          THE COURT:  I previously ordered the DNA back on

21  July 30th of 2019.

22      As far as I'm concerned, I believe that that

23  completes the necessary record.

24      Mr. Dirks or Mr. Raff, is there anything that either

25  of you would like the Court to make a record on?

1          MR. DIRKS:  Not from me, Your Honor.

2          MR. RAFF:  No.

3          THE COURT:  Mr. Woods, I wish you the best of

4    luck.  I hope you take this seriously, and I hope that

5    you make -- take full advantage of all the treatment

6    that's going to be provided to you.  Good luck to you,

7    sir.

8       We're in recess on that matter.

9       (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

002383

1    STATE OF WISCONSIN )
                        ) SS
2    COUNTY OF ROCK     )

3

4           I, Jennifer Klaren, district court reporter for

5    Rock County, Wisconsin, do hereby certify that I

6    reported the foregoing proceedings on September 27, 2019

7    and that the transcript annexed hereto is a full, true,

8    and correct transcript of my stenographic notes reduced

9    to typewritten form.

10                        Dated October 19, 2019.

11

12

13                   Electronically Signed By Jennifer Klaren
                           Jennifer Klaren, RPR
14                         District Court Reporter
                           Rock County Courthouse
15                         Janesville, WI 53545
                                608.743.2256
16

17

18

19

20

21

22

23

24

25

002384